WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Pointe Educational Services,<br><br>              Plaintiff,<br><br>v.<br><br>A.T., et al.,<br><br>              Defendants. | No. CV-13-01918-PHX-NVW<br><br>**ORDER** |

Before the Court are Pointe Educational Services' Motion for Summary Judgment (Doc. 33), the response (Doc. 40), and the reply (Doc. 42); and Pointe's Motion for Partial Remand of Certain Issues (Doc. 39), the response (Doc. 45), and the reply (Doc. 46).  The parties also presented oral argument on August 6, 2014.  The Court addresses the Motion for Summary Judgment first and the Motion for Partial Remand second.  For the following reasons, the Motion for Summary Judgment will be granted and the judgment of the administrative law judge reversed, and the Motion for Partial Remand will be denied.

**I.     MOTION FOR SUMMARY JUDGMENT**

   **A.     Background**

A.T. is an eight-year old autistic student who qualifies for special education under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 *et seq*.  The IDEA "seeks to ensure that 'all children with disabilities have available to them a free appropriate public education[.]'  Under IDEA, school districts must create an 'individualized education

program' (IEP) for each disabled child." *Schaffer v. Weast*, 546 U.S. 49, 51 (2005) (quoting 20 U.S.C. § 1400(d)(1)(A)).

In the 2012–13 academic year, A.T. attended first grade at a school within Pointe Educational Services' school district. His school developed an IEP, which included "goals and services in academics, speech and language, Occupational Therapy . . . and social/emotional/behavior supports." Doc. 1-1 at 4; Doc. 41 at 11.

A.T. exhibited disruptive behavior during the academic year. The parties offer competing characterizations, but the behavior itself is undisputed: A.T. whined, cried, yelled, argued, disrupted class, was noncompliant, and walked into the wrong classrooms. *See* Doc. 34 at 2; Doc. 41 at 2–3. His most physically aggressive behavior involved "removing a teacher's hand from his arm." Doc. 1-1 at 6. His behavior problems culminated in a Manifestation Determination Review and IEP meeting in January 2013, in which his IEP team determined that A.T. "would benefit from placement in a private day school as the interventions implemented to address his behaviors have not been successful." *Id.* The IEP team concluded that private day placement would address both behavioral and academic needs. *See* Doc. 34 at 3; Doc. 41 at 5.

Pointe selected the Austin Center for Exceptional Students (ACES) and provided written notice to A.T.'s parents on January 17, 2013. A.T.'s father responded the same day and expressed concern over the logistics of his son attending ACES. A.T.'s mother would be unable to pick up A.T. from ACES and A.T.'s brother from a different school, Gateway Academy, because of the release time at ACES. On January 21, Pointe informed A.T.'s father that placement decisions are based on services provided rather than schedules. *See* Doc. 34-1 at 61. The next day, A.T.'s father again emailed Pointe to express concern over whether the placement would meet A.T.'s IEP needs. He informed Pointe he would visit ACES, and he asked Pointe to consider and tour two other schools: Gateway Academy and New Way Learning Academy. *Id.* at 57. The IEP team met in early February to discuss placement at ACES, Gateway, and New Way. Pointe maintained its decision to send A.T. to ACES. Doc. 1-1 at 20.

1  Perceiving IDEA violations, A.T.'s parents filed a due process complaint.  Among
2  other claims, they challenged Pointe's decision to place him at ACES.  Because A.T.'s
3  family sought relief from Pointe's decision, they bore the burden of persuasion at the due
4  process hearing.  *See Schaffer*, 546 U.S. at 51.  An administrative law judge (ALJ) held a
5  two-day evidentiary hearing and invited post-hearing briefs.  She subsequently issued a 21-
6  page order concluding, in relevant part, that Pointe violated the IDEA because placement at
7  ACES did not provide a "free appropriate public education" (FAPE) as required by 20
8  U.S.C. § 1400(d)(1)(A).  The ALJ made explicit that she had "considered the entire record,
9  including the testimony and Exhibits," in finding facts and making conclusions of law, and
10 noted that she had "read and considered each admitted Exhibit, even if not mentioned in this
11 Decision.  The Administrative Law Judge has also considered the testimony of every
12 witness, even if the witness is not specifically mentioned in this Decision."  Doc. 1-1 at 4 &
13 n.5.

The ALJ reached the following conclusions regarding A.T.'s placement:

> 24.  After the IEP Team determines the educational placement, the school district may select the location at which the services will be provided. "[C]hoosing which school the student will attend is an administrative decision." [*Deer Valley Unified Sch. Dist. v. L.P.*, 942 F. Supp. 2d 880, 887 (D. Ariz. 2013)].  While it is an administrative decision, the location must still be appropriate for Student in that it provides the individualized educational services necessary to provide a FAPE to Student.
>
> 25.  The Administrative Law Judge concludes ACES is not an appropriate location because of the excessive transitions, the inclusion of significantly older students for academic classes, and the severe behavior issues prevalent in other students.  At ACES, Student would be expected to transition approximately half the day.  More significantly, those transitions would include students up to five years older than Student transitioning into Student's academic classes.  These significantly older students exhibit more severe behavior issues than Student has been described as having including physical aggression, sexual acting out, and drug issues.
>
> 26.  Also of note was that ACES was at capacity at the time Respondent Pointe proposed to enroll Student.  Therefore, even if ACES had been appropriate in terms of meeting Student's needs, ACES was not appropriate at the time because it was not an available option.

*Id.* at 20–21 (footnote omitted).  She then concluded Pointe must place A.T. at Gateway Academy.

> 27. The evidence submitted by Petitioners establishes that Gateway Academy is an appropriate location for Student.  The classmates, curriculum, and structure are appropriate for him to make progress towards the IEP goals.  Student would only be with other students his age.  Its focus on autism spectrum students ensures that Gateway Academy can address Student's behavioral and emotional needs.  While there are transitions, there are fewer transitions and the transitions are used as teaching opportunities.  Student attended Gateway Academy for a half day and was deemed eligible for admission by the staff.
>
> 28. Based on the IEP, the Administrative Law Judge Concludes the appropriate location is Gateway Academy.

*Id.* at 21.

### B.     STANDARD OF REVIEW

"A party aggrieved by the findings and decision of an ALJ in a due process hearing may seek review through a civil action in United States district court." *L.M. v. Capistrano Unified Sch. Dist.*, 556 F.3d 900, 908 (9th Cir. 2009) (citing 20 U.S.C. § 1415(i)(2)). "Though the parties may call the procedure a 'motion for summary judgment' in order to obtain a calendar date from the district court's case management clerk, the procedure is in substance an appeal from an administrative determination, not a summary judgment." *Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 892 (9th Cir. 1995).  The IDEA provides three specific instructions to reviewing district courts.    They "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C).

Notably, however, "judicial review in IDEA cases differs substantially from judicial review of other agency actions, in which courts generally are confined to the administrative record and are held to a highly deferential standard of review." *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1471 (9th Cir. 1993).   The Ninth Circuit has construed § 1415(i)(2)(C) "as calling for de novo review of the state hearing officer's findings and

- 4 -

conclusions," but also as impliedly instructing district courts to give "due weight" to the administrative proceedings. *Ashland Sch. Dist. v. Parents of Student R.J.*, 588 F.3d 1004, 1008 (9th Cir. 2009). This requires giving "deference to the state hearing officer's findings, particularly when they are thorough and careful, and avoid[ing] substituting its own notions of sound educational policy for those of the school authorities which it reviews." *Id.* at 1008–09 (alterations, citations, and quotation marks omitted); *see also L.M.*, 556 F.3d at 908 ("A district court shall accord more deference to administrative agency findings that it considers thorough and careful.") (quotation marks omitted). Ultimately, however, the Court "is free to determine independently how much weight to give the state hearing officer's determinations." *Ashland*, 588 F.3d at 1009.

### C.   ANALYSIS

A.T.'s placement at ACES provides a FAPE—and thus satisfies the IDEA—if it "(1) addresses his unique needs, (2) provides adequate support services so he can take advantage of the educational opportunities and (3) is in accord with the individualized education program." *Park v. Anaheim Union High Sch. Dist.*, 464 F.3d 1025, 1033 (9th Cir. 2006). Notably, a free *appropriate* public education "does not mean the absolutely best or potential-maximizing education for the individual child. The states are obliged to provide a basic floor of opportunity through a program individually designed to provide educational benefit to the handicapped child." *Jackson*, 4 F.3d at 1474 (alterations and quotation marks omitted). The educational benefit must be "meaningful." *N.B. v. Hellgate Elementary Sch. Dist.*, 541 F.3d 1202, 1212–13 (9th Cir. 2008) ("Under the 1997 amendments to the IDEA, a school must provide a student with a 'meaningful benefit' in order to satisfy the substantive requirements of the IDEA.").

Pointe contends that the ALJ lost sight of her primary inquiry—whether ACES could provide a FAPE—and impermissibly compared ACES with Gateway Academy, the school she and A.T.'s parents perceived as superior. *See Gregory K. v. Longview Sch. Dist.*, 811 F.2d 1307, 1314 (9th Cir. 1987) (Review "must focus primarily on the District's proposed

placement, not on the alternative that the family preferred. Even if the tutoring were better for Gregory than the District's proposed placement, that would not necessarily mean that the placement was inappropriate."). Although the ALJ did in fact conclude Gateway was a better placement, she began with the conclusion that ACES was *not* appropriate. The question is whether that conclusion was correct.

As the excerpted decision above reflects, the ALJ rejected ACES based on its excessive transitions, the inclusion of significantly older students for academic classes, and the severe behavior issues prevalent in other students. Finally, she concluded that in any event ACES could not provide a FAPE because it was at capacity when Pointe selected it. Pointe objects to each of these explanations. This case posed difficult challenges both to this Court and the ALJ. That Gateway Academy appears to be a better fit for A.T. quite reasonably affects evaluation of Pointe's placement. Despite the better fit, however, A.T. did not prove that ACES's perceived shortcomings precluded it from providing a FAPE. Because Pointe did not violate the IDEA, the decision below will be reversed.

### 1. Transitions

A.T.'s IEP reflects challenges with transitions between classes. Although not a separate, explicit focus, the transition goal was "embedded in other things." Reporter's Transcript of Proceedings, April 2, 2013, at 114:23-24 [hereinafter "AR029, 4/2/2013"]; *see also id.* at 121:3-6, 123:17-23. Pointe believes the ACES approach to transitions provides a FAPE, and it makes two arguments in support.

First, most ACES students also struggle with transitions. Pointe offers testimony of Gay Hardy, school psychologist at ACES, that "90 percent of [ACES] kids have difficulty transitioning from class to class. That's just kind of a given with students who come to the ACES." Reporter's Transcript of Proceedings, April 1, 2013, at 26:9-11 [hereinafter "AR029, 4/1/2013"]. Second, ACES helps students manage transition problems. Pointe offers Hardy's testimony affirming that "ACES is designed to help students with [transitions]." *Id.* at 29:8-10. She elaborated, "The students, when they changes classes, are

taken in line with staff. So there's the teacher, teaching assistant, and behavior coaches escorting students to classes in a line." *Id.* at 29:10-13. Indeed, relying on the testimony of Katie Sprouls, a school psychologist "who contracts with Pointe to perform evaluations for its students" and who was added to A.T.'s IEP team just before Pointe selected ACES, Doc. 42 at 3, 6, Pointe argues that ACES is appropriate *because* it confronts and works on transition issues rather than minimize them. Indeed, Sprouls testified that "for all skill development in the schools, especially students with special education needs, that you want to make sure you have your end all goal but have your small objectives of how you're going to build up to that. So if transitioning is the overall goal, then you're going to continue doing activities to increase ability their [sic] achieve that." AR029, 4/2/2013, at 102:23–103:4; *see also id.* at 103:5–14 (Sprouls affirming she would not "just leave [a student] in one classroom all day long" because he "has difficulty transitioning").

In contrast, A.T. offered testimony from Kim Yamamoto, who does not have academic training in special education but nonetheless has served as an advocate for students with special needs for 15 years. *See* AR029, 4/1/2013, at 177:3-13. A.T.'s parents hired Yamamoto in January 2013 to help them navigate the special education world. *See* AR029, 4/2/2013, at 25:18-20; AR029, 4/1/2013, at 177:24-25. After meeting with A.T. and his parents, familiarizing herself with his IEP, sitting in on IEP meetings, and visiting ACES with A.T.'s father, Yamamoto flagged the transitions at ACES as particularly alarming:

> Having lots of transitions, he would transition for every academic period they said to where the other kids in the school were functioning at his academic level. So that would be reading; math; language arts, . . . ; and then back to his classroom for science, and then back out to another setting for the reflection time, the emotional reflection time that they have. They do that in combination so they transition to another class.
>
> Transitions are the toughest things for kids with autism, and putting them through all those transitions was a red flag for me. You know, that is not something that you would do in an autism program. Or that is not something that would be typically set up.

AR029, 4/1/2013, at 196:18–197:7.

Confronted with conflicting evidence, the ALJ made the following findings to support her conclusion regarding transitions:

> 3.   Student began exhibiting problem behaviors [in the fall of 2012]. These behaviors included . . . wandering into other classrooms during transitions.
>
> . . . .
>
> 22.   The September 25, 2012, IEP included a notation that Student "has a sweet disposition and has a deep desire to please. . . . [He] often struggles with transitions (40% of the time)."
>
> . . . .
>
> 27.   During the February 6, 2013, IEP meeting, Parent A.T. also requested that a goal addressing transitions be included in the IEP. While the IEP team agreed transitions were an issue for Student, as had been noted in the September 25, 2012, IEP, Petitioners' requested goal addressing transitions was not adopted.
>
> . . . .
>
> 33.   For reading, writing, and math, Students at ACES spend "about half of the day . . . changing classes for those academic subjects."

Doc. 1-1 at 5, 8, 9, 11. Although the ALJ "considered the testimony of every witness," *id.* at 4 n.5, she did not make specific credibility determinations. She did not explicitly compare the testimony of Yamamoto to Sprouls and Hardy and explain why she presumably found the former more convincing than the latter two.

Nonetheless, the ALJ's decision implicitly turned on favoring Yamamoto's testimony. This was not reasonable. Both Yamamoto and Sprouls had very limited experience with A.T., particularly in the classroom. Sprouls testified she had never met A.T, spoken to his parents, *see* AR029, 4/2/2013, at 101:1-4, 105:12-13, or "issue[d] any kind of report on Student." *Id.* at 113:15-17. Instead, she "came in entirely as an interpreter of evaluations." *Id.* But similarly, Yamamoto testified she "really couldn't judge on [the appropriateness of A.T.'s Statement of Behavior Plan] because I couldn't see him in the classroom."[1] AR029, 4/1/2013, at 186:2-3. She also conceded her "opinion of [A.T.] is very limited . . . ." *Id.* at 195:4. And aside from her experience as a student advocate, Yamamoto possesses no academic background in special education, school psychology, or a relevant field. Moreover, her concerns about ACES reflect global opinions about students

---

[1] Pointe refused to allow Ms. Yamamoto to observe A.T. in the classroom. *See* AR029, 4/1/2013, at 35:13-16.

with autism. *See id.* at 197:3-7 ("Transitions are the toughest things for kids with autism. . . . You know, that is not something that you would do in an autism program."). Although the value of Yamamoto's testimony derives from her familiarity with A.T.'s unique needs, her testimony on this point does not reflect such particularized knowledge.

The question of whether the ACES approach to transitions would accord with A.T.'s IEP may be the kind of "educational policy" election the district court should be careful not to second guess. *Cf. Gregory K.*, 811 F.2d at 1314 ("The 'due weight' that courts must give to the state education agency's findings on matters of educational policy should prompt courts in the future to provide a more thorough explanation when reversing an agency's ruling on the appropriateness of a special education placement."). But Arizona employs a central panel of administrative law judges utilized by various state agencies. *See* A.R.S. § 41-1092.01. The practice promotes neutrality, but it trades off with agency expertise. This in turn decreases the institutional competency gap between the Court and the ALJ, and thus the extent to which concerns about institutional competency motivate deference to her findings on matters of educational policy.

Moreover, the due weight afforded an ALJ decision varies with the thoroughness of analysis. *See Wartenberg*, 59 F.3d at 891 ("When exercising its discretion to determine what weight to give the hearing officer's findings, one criterion we have found useful is to examine the thoroughness of those findings. The amount of deference accorded the hearing officer's findings increases where they are thorough and careful.") (quotation marks omitted). Aside from noting A.T.'s struggles with transitions and reciting the amount of transitioning at ACES, the ALJ did not undertake any analysis of why the ACES approach is not appropriate as Hardy and Sprouls testified. Hardy testified that ACES serves many students who struggle with transitions and that the school provides the support system necessary to help students overcome those challenges. Moreover, Sprouls testified that this approach promotes skill development. Notably, the ALJ's conclusion that Gateway Academy would provide a FAPE turned in part on finding that its fewer transitions "are used as teaching opportunities." Doc. 1-1 at 21. But beyond the difference in volume, the

1   ALJ did not explain why ACES's instructive approach to transitions failed to meet A.T.'s
2   needs where Gateway's succeeded.

3   With only limited testimony that the ACES approach to transitions would not
4   address A.T.'s unique needs—and contrary testimony that the approach is pedagogically
5   sound—A.T. did not meet his burden to demonstrate by a preponderance of the evidence
6   that the ACES approach would not provide the meaningful benefit the IDEA requires.

### 2. Older students in classes

The ALJ determined that the ACES transitions would inappropriately bring students up to five grade levels ahead of A.T. into half of his classes. The presence of older students in A.T.'s academic classes partly motivated her conclusion that ACES would not provide a FAPE. She made the following finding in support:

> 32.  Typically, ACES classes "have at least two grade levels together, no more than three." Therefore, kindergarten and first grade students may be in a class together with some second grade students, third and fourth grade students may be in a class together, and fifth and sixth grade students may be in a class together. However, for the academic subjects of reading, math, and writing, students are grouped according to ability. Therefore, a sixth grade student who cannot read may be in a class with kindergarten and first grade students of the same reading level.

*Id.* at 10–11 (footnotes omitted).

The ALJ relied on Hardy's testimony: All ACES classes have "at least two grade levels together, no more than three. So [the] elementary kindergarten kids you might have kindergarten, first and maybe some second. Then we have second/third, third/fourth, fourth/fifth." AR029, 4/1/2013, at 18:14-17. Hardy testified that A.T. could be in a classroom with sixth graders possessing similar academic skills—who read at his level, for example—and that, in fact, ACES educated one sixth grader who fit that description when Pointe selected it. *See id.* at 25:5-21, 28:15–29:4. Similarly, Sprouls testified that schools commonly mix students of varying ages with similar academic skills. For example, it would be appropriate to place A.T. in a class with older students when working on reading skills. *See* AR029, 4/2/2013, at 103:15–104:8. She noted, "if you have an eighth grader

1   reading at a first grade level and you have a third grader reading at a first grade level and
2   you have activities that are appropriate for that skill set in that age range then that's actually
3   a fairly common practice you would see in schools." *Id.* at 104:21-25.  Although Sprouls
4   testified that it would not be appropriate to place first and sixth grade students together if
5   "you're working on behavior" or "to develop say social skills business social skills," *id.* at
6   104:9-11, 104:17-20, she noted that "when it's academic skills . . . there's a lot of schools
7   actually that do ability level and skill level as opposed to age level." *Id.* at 117:9-11.

8           A.T. argues primarily that because all ACES students have behavioral challenges,
9   and because Sprouls testified that grouping by skill level rather than age is inappropriate
10  when targeting behavior and social skills, the mixed-age academic classes involve de facto
11  social skill building and thus are inappropriate.

12          As an initial matter, little evidence supports A.T.'s concern that younger students and
13  older students are regularly educated together.  Hardy testified that there was one sixth
14  grade student with delayed reading skills who could be in A.T.'s class, but there is no
15  evidence of other, older students in need of remedial academic skills.  The ALJ's conclusion
16  that A.T.'s classes would include "significantly older students"—plural—appears to rest on
17  Hardy speculating that such inclusion would be *possible*.  Doc. 1-1 at 20.  Additionally, no
18  specific evidence supports A.T.'s speculation that "ACES has to be working on behavior
19  issues even during academics" because ACES students have behavior challenges.  Doc. 40
20  at 9.  A.T. has not proffered any testimony demonstrating, for example, that academic
21  classes routinely devolve into lessons on behavior or social skills.  In the absence of any
22  such evidence, A.T. has not demonstrated that the potential for mix-aged classrooms fails to
23  "(1) address[] his unique needs, (2) provide[] adequate support services so he can take
24  advantage of the educational opportunities [or] (3) . . . accord with the individualized
25  education program." *Park v. Anaheim Union High Sch. Dist.*, 464 F.3d 1025, 1033 (9th Cir.
26  2006).  Indeed, the ALJ did not explain how the inclusion of older students, even if likely,
27  would suffice to deny a meaningful educational benefit.  A.T.'s speculation is insufficient to
28  show that mixed-age classes preclude ACES from offering a FAPE.

### 3. More serious behavioral issues

The ALJ also expressed concern with the "severe behavior issues prevalent in other students" at ACES. Doc. 1-1 at 20. Indeed, her concern about A.T.'s exposure to older students reflected her conclusion that "[t]hese significantly older students exhibit more severe behavior issues than Student has been described as having including physical aggression, sexual acting out, and drug issues." *Id.* The ALJ made three specific findings to support these conclusions:

> 28. Gay Hardy, School Psychologist at ACES, testified regarding the student body, curriculum, and staff at ACES. According to Ms. Hardy, ACES is a school that "deals with students with significant behavior concerns" and "the students who come to ACES are having difficulty managing their behavior in a public school setting, lots of anger management, impulse control, that kind of thing." ACES "work[s] hard on helping our kids develop strategies and coping skills to deal with those issues."
> 29. Ms. Hardy acknowledged that the students who come to ACES "have serious issues."
> 30. ACES has students who have been suspended or expelled from public schools for weapons violations, acting out sexually, and drugs.

*Id.* at 10 (footnotes omitted).

Hardy's testimony elaborates: ACES educates "some students who have been long-term suspended from public schools because they had a pocketknife in their pocket, that kind of thing," some students who have been suspended for "some sexual acting out," and some students who have been suspended for drugs. AR029, 4/1/2013, at 24:5–25:4. Hardy testified that ACES "typically" does not see severe behavior once the students acclimate to the school (after transferring from public schools) and that ACES is in fact a "very safe place." *Id.* at 20:5-13. Pointe proffers Hardy's testimony that ACES separates its younger students from the behavior of its middle and high school students by educating them in different parts of the building. *See id.* at 17:21-25. Still, this does not shield students like A.T. from the more severe behavior of his cohorts or any older elementary school students who may transition into his academic skills classes.

1    Consistent with this testimony and the ALJ's findings, Yamamoto testified that she
2    had placed "lots of different kids" at ACES: "kids who are sexual offenders, kids who have
3    physically acting out behaviors, kids who have extreme school phobia, lots of different
4    emotional behavioral issues that are not necessarily handled in the public school system."
5    *Id.* at 194:17-21.  Yamamoto testified that none of the students she had placed at ACES
6    paralleled A.T. in terms of disability and behavior.  *Id.* at 194:22-24.  Similarly, Faith Thaw,
7    an independent contractor and student advocate hired by Pointe to ensure compliance with
8    special education law, testified that Pointe "tend[s] to use ACES when we have children
9    with severe behavior problems."  *Id.* at 115:1-3.

10   Pointe offers evidence that many ACES students display behavior similar to A.T.
11   ACES students begin as "externalizers" who scream, cry, and fail to regulate their behavior.
12   Doc. 33 at 10–11 (quoting Hardy).  But Hardy also testified, and Pointe does not contradict,
13   that ACES students hit, kick, and throw objects.  *See* AR029, 4/1/2013, at 19:17-22.
14   Although Pointe emphasizes that A.T.'s IEP had been recently modified to address
15   escalating behavior, *see, e.g.*, Doc. 42 at 8 ("[T]he ALJ failed to appreciate Student's
16   significant behavioral issues that he manifested around the time of the IEP."), there is no
17   evidence that his behavior included hitting or kicking, let alone drug use or sexual conduct.
18   For example, A.T.'s September 2012 IEP sets the following goal: A.T. "will gain attention
19   from others (both staff and students) using positive strategies only (doing well on his work,
20   being positive with classmates when in groups) and refrain from gaining attention using
21   negative approaches (calling out at inappropriate times, pouting) with others at a mastery
22   rate of 80% starting at a baseline of 50%."  Doc. 34-1 at 24.  Similarly, the November 2012
23   addendum to A.T.'s IEP focusing on behavior identifies intervention strategies for "non-
24   compliance to direction, say[ing] no, crying, yelling, arguing, aggressive in nature
25   behavior."  *Id.* at 33.  A.T.'s behavior simply did not rise to the level prevalent at ACES.

26   The question then is whether a school that serves students who enter with more
27   serious behavioral challenges can also adequately address A.T.'s IEP-identified needs.  *See*
28   *Park*, 464 F.3d at 1033.  Although the ALJ expressed concern about other students'

behavior, she did not explain how those behaviors would preclude ACES from offering A.T. a FAPE.

The evidence supports the contrary. Hardy testified that students who come to ACES have "difficulty managing their behavior in a public school setting, lots of anger management, impulse control, that kind of thing. So we work hard on helping our kids develop strategies and coping skills to deal with those issues." AR029, 4/1/2013, at 17:9-13. In addition, ACES offers a "Jump Start" program specifically for students in the autism spectrum. *Id.* at 18:3-5. Hardy testified that each classroom includes "a certified special ed teacher, [a] teaching assistant, and a behavior coach. We also have behavior coaches monitoring hallways at all times." *Id.* at 19:2-8. According to Hardy, these approaches work. Students display fewer behavioral outbursts as they acclimate to ACES, and the school returns approximately 20–25 percent of its students to the general educational environment each year. *See id.* at 21:8-14.

Moreover, ACES serves students who scream, cry, and display physical aggression. Likewise, the evidence demonstrates A.T. yelled, cried, and demonstrated behavior that was "aggressive in nature." Doc. 34-1 at 33. Because ACES serves students who display some behavior similar to A.T.—in addition to students who display more serious behavior—and because it has a program designed specifically for students with autism, it has the capacity and experience to serve the behavioral needs reflected in A.T.'s IEP. As a result, A.T. has not met his burden to show ACES cannot provide a meaningful educational benefit with respect to his behavior notwithstanding that it also serves students with more severe behavioral problems.

### 4. Availability

Finally, the ALJ concluded that even if the ACES curriculum and pedagogy provided a FAPE, it had no room for A.T. when Pointe selected the placement. She based this conclusion on Hardy's testimony. A.T.'s parents toured ACES on January 23. At that time the class A.T. would join—the kindergarten through second grade classroom—

included fourteen children, its maximum capacity. *See* AR029, 4/1/2013, at 23:2-6. Hardy testified that ACES had hired a new teacher who began in January and that this new teacher completed her three-to-four week training period and opened her own classroom for A.T.'s age group "probably the week after" the tour. *Id.* at 23:6-11.

Contrary to A.T.'s assertion, that ACES did not have space the day A.T.'s family toured does not necessarily make it inappropriate, so long as sufficient information about the future setting is available to evaluate fit. *See Fuhrmann v. E. Hanover Bd. of Educ.*, 993 F.2d 1031, 1039 (3d Cir. 1993). In *Fuhrmann*, the Third Circuit upheld a student placement despite the parents' protests that the program's newness precluded observation; it thus could not be "reasonably calculated to meet [the student's] individual needs." *Id.* at 1038. The court disagreed:

> The fact that the Jointure program was in its inception when East Hanover recommended placement there does not make that placement inappropriate. G.F.'s acceptance at Jointure was unconditional. At the time of the administrative hearing, Jointure had already accepted four students for the 1990–91 school year, ranging in age from five to eight and exhibiting approximately the same level of autistic-like behavior as G.F.

*Id.* at 1039 (citation omitted).

Similarly, an Arizona administrative law judge quoted *Fuhrmann* in a 2004 decision rejecting a district's proposed placement. There, the administrative law judge reached the following conclusion:

> That the teacher and aide were not hired, nor were the students selected for the school program by the August, 2004 IEP meeting does not automatically preclude it from being a placement which provides FAPE for this child. At any time during the school year a teacher, or an aide or both may need to be replaced. A class may start a few days late or may start with a substitute, and FAPE may still be provided.

*Phoenix Elementary Sch. Dist.*, 105 LRP 56677, at 12 (2004) (alterations omitted) (Doc. 40-1). Like the Third Circuit, the Arizona administrative law judge evaluated appropriateness based on what the district knew at the time of placement:

> Since the teacher, aide and actual class composition at the school were unavailable to the IEP team participants, the determination of whether the placement provided FAPE is based on what was known at that time. The

    class size was anticipated to be 20. The percentage of native English speakers was anticipated to be 20 to 25% or 4 to 5 students. The remainder of the class composition would be children who spoke only or primarily Spanish. The teacher and was [sic] anticipated to be bilingual, certified but not in special education and was not anticipated to have any particular training in working with children with speech language deficits. The regular class aide was anticipated to be bilingual. The full time speech aide was anticipated to have a two year certificate. It was anticipated that there would be a great deal of Spanish spoken in the classroom, particularly among the students. The physical setting was known to be a large classroom with multiple activity stations all in use at the same time.

*Id.* at 12–13.

  Thus, in *Fuhrmann* and the Arizona administrative decision, the adjudicators looked to those aspects they knew about the nascent programs, such as the number of students, the students' abilities, and the faculty's qualifications. Courts in this circuit have looked to the same factors when evaluating the appropriateness of extant settings. *See Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1525 (9th Cir. 1994) (inappropriate to place autistic child in setting with "no other autistic children" and where "there was no evidence that the teacher had been trained to work with autistic children"); *Deer Valley Unified Sch. Dist. v. L.P.*, 942 F. Supp. 2d 880, 886–87 (D. Ariz. 2013) (inappropriate to place autistic child with IEP-designated communication goals in a classroom "with non-verbal peers with whom he cannot communicate verbally").

  A.T. argues ACES was inappropriate when Pointe offered it because the number of students in his eventual class was unknown. Pointe responds that the parties knew the following when it selected ACES: the school had 14 students in its kindergarten–second grade class, and it had hired a teacher in January who began about one week after A.T.'s visit.[2] Pointe deduces that A.T.'s class thus would have served seven or eight students and,

---

[2] This is only partially correct. Hardy knew ACES hired a new teacher in January and testified that new teachers interned for "three or four weeks" before opening a class. AR029, 4/1/2013, at 23:9-10. But at the time A.T.'s family toured ACES, Hardy testified she did not know the timeline for opening the new class. *See id.* at 23:12 (Hardy testifying that at the time of the tour she "really did not know that time line").

- 16 -

1  like its other classes, would have included three staff members: a certified special education
2  teacher, a teaching assistant, and a behavior coach.

3  Pointe's position is more persuasive. First, the ALJ was not precluded from looking
4  to the nascent classroom to evaluate its appropriateness. *See Fuhrmann*, 993 F.2d at 1039;
5  *see also E.M. v. Pajaro Valley Unified Sch. Dist.*, 652 F.3d 999, 1006 (9th Cir. 2011) ("It is
6  true that we have said that actions of the school systems . . . cannot be judged exclusively in
7  hindsight. But that exclusive use of hindsight is forbidden does not preclude consideration
8  of subsequent events.") (citations and quotation marks omitted). Second, A.T. did not show
9  that its newness precluded meaningful evaluation for fit. A.T. offered no evidence, for
10 example, to contradict the reasonable inference Pointe draws from the school's student
11 composition or to suggest that the pedagogy in the new class (and the qualifications of its
12 instructors) would differ in any meaningful way from its current kindergarten–second grade
13 class. Because ACES could adequately provide a meaningful educational benefit to A.T.,
14 the mere fact his class would not have been ready for a week (or two) does not render it an
15 inappropriate placement. Neither the law nor the evidence supports the ALJ's finding on
16 this issue.

18  5. <u>Conclusion</u>

19  Both the ALJ and this Court were presented with a close case, which was made more
20 difficult by the perception that ACES was less attractive than Gateway Academy.
21 Testimony elicited from A.T.'s father reinforced this perception. He recounted a visit to
22 ACES:

> Bars on the outside of the school bent in. To me it looked like the last stop before you go to prison, kids up against the wall like they're ready to be patted down by a policeman, with their -- I think they call them minders but really they're their bodyguards in case the kid lashes out to prevent any physical harm. But yeah, both times actually kids were outside up against the wall, being talked to, things like that.
> So that's -- to me in listening to [Hardy]'s description, we talked about the different types of kids that come to this school. And when I listened to the description of some of the types of kids that go to ACES, that's not my son.

- 17 -

> My son does not do that stuff. And I'm just like, as a parent, aside from transitions and the reading program and the class size and all of other things, I just -- my gut told me this is not the right place. This is not where he belongs.

AR029, 4/2/2013, at 59:10-25. The Court is sympathetic both to A.T.'s preference and the ALJ's difficult decision. But the IDEA—and not a parent's gut—supplies the standard by which a placement decision is reviewed. Pointe's decision to send A.T. to ACES disappointed his parents but did not violate the law. Summary judgment will be granted to Pointe and the ALJ's decision reversed.

## II.    MOTION TO REMAND

### A.    Procedural Background

On December 13, 2013, before Pointe filed the pending Motion for Summary Judgment, the Court remanded this case to the ALJ to clarify her decision regarding tuition and transportation costs. In the course of the subsequent January 2014 proceedings, Pointe learned A.T.'s parents had applied for and received funds from the Arizona Empowerment Scholarship Account (ESA) in 2013. Arizona established the ESA fund "to provide options for the education of students in this state." A.R.S. § 15-2402(A). Essentially, the ESA program enables parents of students with disabilities to finance some private school education expenses with state funds.

In summer 2013, A.T.'s parents withdrew him from his Pointe school pending resolution of the due process hearing and enrolled him at Gateway Academy as a private student using ESA funds. By statute, receipt of ESA funds "release[s] the school district from all obligations to educate the qualified student." *Id.* § 15-2402(B)(2). According to Pointe, A.T.'s July 2013 receipt of ESA funds discharged its obligation to provide a FAPE. Following the January proceedings, Pointe moved the ALJ to reconsider her decision regarding placement in light of the ESA issue. She declined, concluding that her August 2013 order constituted a final decision under state law, that the January proceedings and decision served only to clarify that order, and that she lacked jurisdiction to adjudicate the

substance of Pointe's motion for reconsideration. Pointe filed the pending Motion for Partial Remand (Doc. 39) to press its claim to the ALJ in the first instance.

### B. Analysis

A.R.S. §15-2402(B)(2) releases the school district from its obligation to educate a student receiving ESA funds. But Pointe overstates the effect of this release. The statute requires only that "students not simultaneously enroll in a public school while receiving ESA funds." *Niehaus v. Huppenthal*, 233 Ariz. 195, 201, 310 P.3d 983, 989 (App. 2013), *review denied*, (Mar. 21, 2014). Pointe's obligation is discharged while A.T. receives ESA funds, but it is triggered again once A.T. stops receiving them. *See id.* ("[T]he public school is obligated to accept a child that has terminated the ESA contract just as the public school would be obligated to accept any other child."). Because "the ESA does not require a permanent or irrevocable forfeiture of the right to a free public education," *id.*, it does not work a permanent or irrevocable discharge of Pointe's duty to A.T. Thus, A.T.'s receipt of ESA funds for some disputed period in 2013 does not permanently release Pointe of its obligation to provide a FAPE.

Contrary to Pointe's assertion, the ESA issue does not dispose of the inquiry above. Nonetheless, because the Court will reverse the administrative decision on the merits, it will deny the motion for partial remand so that Pointe can "address the ESA Issue in a separate state administrative proceeding," Doc. 46 at 1 n.1, as it suggests.

IT IS THEREFORE ORDERED granting Pointe Educational Services' Motion for Summary Judgment (Doc. 33).

IT IS FURTHER ORDERED denying Pointe's Motion for Partial Remand of Certain Issues (Doc. 39).

///
///
///
///

1       The Clerk shall enter judgment for Plaintiff/Counterdefendant Pointe Educational
2  Services and terminate this appeal.
3       Dated this 14th day of August, 2014.

                    _____
                           Neil V. Wake
                    United States District Judge